## [No. 3581.]

### Anthony Price *v.* The State.

1. JUSTIFIABLE HOMICIDE — STATUTE CONSTRUED.— Article 567 of the Penal Code reads as follows: "Homicide is justifiable when committed by the husband upon the person of any one taken in the act of adultery with the wife, provided the killing take place before the parties to the act of adultery have separated." *Held*, that a proper construction of the term "taken in the act of adultery," as used in the statute, does not mean that, in order to avail himself of the protection of the statute, and justify his homicidal act, the husband should be an actual eye-witness to the physical act of coition between his wife and her paramour, but it will be sufficient if he sees the paramour in bed with his wife, or leaving it, or in such a position as indicates with reasonable certainty to a rational mind that they had just then committed the adulterous act, or were then about to commit it. But no knowledge otherwise acquired by the husband, however positive of the adulterous intercourse between his wife and her paramour, will bring the homicide, if he slays the latter, within the purview of the statute. See the opinion *in extenso* on the question, and note the facts of this case in illustration.

2. SAME — ADULTERY.— CIRCUMSTANTIAL EVIDENCE is as competent as direct evidence to establish the fact of adultery when such fact is an issue on the trial, and, though a mistake may possibly exist as to the fact, yet "if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal, he is guilty of no offense, provided it be such mistake as does not arise from want of proper care on his part." In other words, a person may always act upon reasonable appearances, and his guilt depends upon the reasonableness of the appearances, judged of from his own standpoint.

3. SAME — CHARGE OF THE COURT.— The gist of the issue under the evidence in this case was whether or not the facts tended to show that the parties were "taken in the act of adultery." Such being the case, it was properly a part of the law of the case that the jury should be correctly instructed as to the meaning of the expression "taken in the act of adultery." The interpretation of the phrase most likely to be applied by the jury, in default of a proper explanation, would be that the parties must be detected in the actual, physical act and process of carnal coition; and the charge of the court should have guarded them against such a mistake.

4. SAME.— The phrase " before the parties to the act of adultery have separated," as used in the statute (art. 567, *supra*), properly construed, contemplates only that the parties are still together in company with each other, after the act when the homicide is committed; not that they must still be united in the act of copulation, and the charge of the court, to be sufficient, should so instruct the jury.

5. SAME.— ADULTERY, as it is used in article 567 of the Penal Code, is ecclesiastical and not statutory adultery, and a defendant justifying homicide under that statute need not show the specific offense of adultery as defined by article 333 of the Penal Code, but it will be sufficient if he show a single defilement of his marriage bed; and the jury should be so instructed.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment in this case charged the appellant with the murder of one William Chandler, in Travis county, Texas, on the 27th day of December, 1884. His trial resulted in his conviction of manslaughter, and he was awarded a term of two years in the penitentiary.

Justice of the Peace William Von Rosenburg, Jr., who presided as coroner at the inquest upon the body of the deceased, was first introduced by the State to identify the voluntary statement of the defendant, reduced to writing upon that proceeding, and to establish the proper predicate for the admission of the writing in evidence; which he did. The statement reads as follows:

"My name is Anthony Price. On last Saturday night, December 27, 1884, I went to bed at my house near Austin, in Travis county, Texas, and left my wife, my mother and the deceased, William Chandler, sitting up at the fire in the same room. I went to sleep after some time, but before I went to sleep he said " good night," and went out of the door. After I went to sleep my mother woke me up, and told me that my wife was out of the house, sick, and to go and see about her. I got up, and went to the fire and stood there awhile, and went back to bed again. I thought she might be at prayers, and, therefore, did not go out, and went back to bed. After I went back to bed my mother called me again, and I got up. Having seen a package in the room, I thought that something was wrong, and got up and went out to see if I could see or hear her. I heard talking at my corn-pen, and went back to the house and got my gun. I then went up to the corn-pen and saw the door open. I went in and asked who was in there, and repeated it three times before I got an answer. My wife got up and said: ' It's me, Price;' and said that she went up there to get some corn. I then said: ' Yes, you will get some corn,— come out.' I asked her who was with her, and she said no one. I said there was, and she said, ' No,' and went out at the door. I still asked who was in there, and William Chandler got up and caught the gun. I then backed out at the door, holding the gun, and Chandler also holding to it. After we got out of the door I said: ' Let go of the gun, and let me go on about my business.' My wife was then begging me not to shoot him. He, Chandler, then let loose the gun, and I shot him. I then went home and put on my pants, and heard William Chandler crying and saying: ' O Lord!' I then took my

gun and went back to where he was lying, near where I had shot him, and I hit him on the head twice with the stock of my gun. I can't say how long this was after I shot him. I hit him with the gun because I was angry with him. Just before I hit him, he asked me not to hurt him, and that made me more angry, and I hit him twice on the head with the gun. I then went up to the house of Charles Wilkins, and woke him and his mother, and told them what I had done.

"The deceased, William Chandler, had been in the habit of whispering with my wife in the house, and I had asked him to quit his blackguarding and breaking up my seats in the house. He was also constantly buying things for my wife, and I asked her on Friday and Saturday, December 26 and 27, not to accept his presents. He brought some corn to our corn crib for my wife to make some hominy out of. My wife asked me to bring it up. I refused at first to do so, but afterwards, on Saturday evening, I took it down. Chandler was then there, carrying on his foolishness. He and my wife then shelled the corn and put it on to cook, and by the time it got half done, he took some of it and parched it, and went on up to the house where he was hired. She let the corn cook on after he left, and took it up and put it into a bucket, and went on to the well with it, and I asked her if I might go with her, help her wash it, bring it back, and also bring some water. She said no, that she would bring it back. After waiting a sufficient time for her to be back, I noticed Chandler going down where she was. He came on with her to the house, helping her bring the water and the corn. I was cutting wood. He said to me: 'When you sent your wife off, why didn't you tell her what you sent her after?' and told me that she asked him to bring the water up. They went on into the house, and she commenced getting supper. He remained around there, playing with my wife. I told her to hurry up, and she said she was hurrying all she could. During this time she and Chandler were whispering around a right smart.

"When I went to the corn crib, my wife and Chandler were lying down in the crib. After the light was struck — after I shot him — I found his coat lying in the crib, where they got up from. When he left my house he had his coat on. I do not know what they, Chandler and my wife, were doing in the crib. I did not take time to investigate that. I knew they were after no good. That was the only time I ever saw them lying down together anywhere. I can't say that I thought they were having connection with each other at the time I called to them at the door of the crib,

but, by finding them there together, I supposed that their object was to have connection with each other. I had no knowledge of their having any connection with each other, and I shot him, Chandler, because I felt that that was the object of their being there together at that time."

Doctor Shannon testified, for the State, that the deceased died from the effects of a gun-shot wound, which he described. There was no break or abrasion of the skin on the head, and the deceased, before he died, told the witness that he had his hands on his head when he was struck there.

Jerry Neal testified, for the State, that he lived on a farm adjoining the Wilkins or Compton farm, on which the defendant lived at the time of the homicide. Witness saw the deceased on the night that he was shot, and saw him after he was dead. When witness first saw the deceased after he was wounded, which was between 9 and 10 o'clock at night, on December 27, 1884, he was lying on some shucks in an old house used for storing corn and fodder. That old house stood about seventy yards from the cabin in which the defendant, his wife, and his mother lived. When witness arrived, the defendant was standing at the door of the old house. Witness did not see defendant's wife then, nor has he seen her since. The witness saw a hat and a coat lying in the old house or corn crib in which the deceased lay. Deceased died about daylight on the morning after he was shot. Defendant stayed at home that night, and left for Austin next morning, with the avowed purpose to surrender as the slayer of the deceased. Witness had never heard the defendant's character as a peaceable or quarrelsome, violent man discussed before this homicide.

Charles Wilkins testified, for the State, that both the defendant and the deceased lived on his place, known as the Compton farm, in Travis county, Texas, in houses about two hundred yards apart. Defendant's wife and mother lived with him. Deceased was a single man slightly shorter in build, but stronger than the defendant. Witness heard no shot on the night of the killing, but about 9 o'clock defendant's wife came to witness's house and told him that defendant had shot the deceased. Witness repaired to the defendant's place and found deceased lying, wounded, in an old outhouse used as a corn crib, about seventy yards distant from the cabin in which the defendant lived. His coat, which witness recognized, lay spread out on the floor, and his hat lay near it. No one but defendant's wife was at the defendant's cabin when witness arrived, but Neal and Rector were at the corn crib, where the deceased

lay. Witness went from the corn crib to the house with the defendant, and thence to Neal's. Defendant was then much excited, and appeared half crazy. On the next morning witness accompanied the defendant to Austin, to surrender. No attempt to arrest defendant had yet been made. It had been the habit of the deceased to visit the house of the defendant every two or three weeks, when the defendant's wife was at home. Witness thought defendant knew of these visits, but could not say that he did or did not approve of them.

Linsing, for the defense, testified that he lived near the scene of the killing, but was at Fiskville when it occurred. He heard of the homicide about 10 o'clock that night, and went to the defendant's house where he found the defendant and Mrs. Charles Wilkins. Chandler had not then been, but was soon afterwards found in the corn crib. His coat was spread down on the floor. The reputations of the defendant and the deceased for peace and quietude were good.

Ann Price was the next witness for the defense. She testified that the defendant was her son. She knew Lucy Price, who was the defendant's wife, but who, to her profound satisfaction, was in no way related to her. Witness, defendant, his wife and two children were living on the Compton place, about two hundred yards from where the deceased lived at the time of the homicide. Witness did not see the fatal shot fired, but heard it. Deceased came to the defendant's house on the night of the homicide. He had been there previously on the morning and evening of the same day. Nothing very particular happened before the shooting. All of the parties present sat around the fire talking, deceased and defendant's wife singing Sunday school songs, reading out of the same book and fooling with each other, alternately. The deceased had been playing the fool with the defendant's wife, night after night, and Sunday after Sunday, for some time. He gave her candies, sardines, oysters, apples, cakes, etc., about a week before this particular night. Defendant told his wife not to accept the presents and to have nothing to do with deceased, but she persistently disobeyed him. Deceased played with Lucy in the immediate presence of the defendant.

Deceased and Lucy, on the evening of the homicide, went to the well to wash some hominy, and returned to defendant's house together. Defendant, who was then busy about the place, did not seem to notice them. No supper was had at defendant's house that night, and, after sitting around some time, defendant went to bed, telling Lucy to occupy another seat than the one near Chandler.

At that time witness was sitting near the shed room, Lucy about the middle of the floor, and deceased near a corner of the room. Witness left the room, but returned in a minute and saw the deceased and Lucy whispering together. Defendant was then in bed in the same room, and, the witness thought, asleep. Chandler left shortly. The baby woke up, which seemed to madden Lucy, who gave the baby to witness to hold, and, remarking that she felt sick, went out of the house. Witness became uneasy after a time, wakened the defendant, and told him that, as his wife had gone out complaining, he had better go and see about her. He went out, came back and got his gun, and went out again. Witness soon heard a shot, and heard the defendant ask: "What are you doing there?" Lucy replied: "I came here to get some corn." Defendant asked: "Who is that you have with you?" Lucy said: "Nobody," and defendant replied: "That's not so; come out of there; you have been carrying on long enough; and I have caught you at last." When Lucy replied that she was after corn, witness heard the defendant say: "You know better; you don't want any corn this time of night. You have got some one in there with you; —— come out of there, both of you." Witness did not think that Lucy was at all sick when she left the house that night. She had complained of slight fainting spells a short time before. Defendant knew of Chandler's visits and attentions to his wife, but if he ever objected, witness did not know it. Apparently he paid no attention to it.

The motion for new trial raised the questions involved in the opinion.

*Dowell & Wooten*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant was convicted of manslaughter committed upon one William Chandler; his punishment being assessed at two years' confinement in the penitentiary.

Before the homicide appellant had evidently become dissatisfied with the familiarity, which had existed for some time, as shown in the conduct of his wife towards deceased, and the deceased towards his wife. He may even have entertained suspicions that all was not as it should be between them, or, to say the least of it, he felt that their conduct was highly improper.

On the night of the homicide he had evinced this state of feeling of dissatisfaction and suspicion in more than one particular, when

deceased and his wife had been seen whispering and "carrying on together," before he retired to his bed, leaving his wife, the deceased and his mother still sitting by the fire. But he retired and went to sleep. Not long after, Chandler, the deceased, left; and not long after he had, ostensibly, gone to his home, defendant's wife, complaining of feeling sick, went out. She was gone so long that defendant's mother became uneasy, woke defendant up, and told him he had better go and see what was the matter. Defendant finally got up, and, hearing persons talking in his corn-pen, went back into the house, got his gun, went to the corn-pen, found the door open, went in and asked "who was there?" After this question had been repeated three times by him, his wife, who was lying down with some one in the crib, got up and answered "it's me, Price," and said she had gone there to get some corn. Defendant told her to come out, and asked "who was with her?" She replied "no one." Defendant insisted there was some one. She said "no," and went out at the door. Defendant again asked who was there, and deceased got up and caught the gun. Defendant backed out of the door, the parties struggling over the gun. After getting out of the door defendant said, "let go the gun, and let me go about my business"— the wife begging her husband not to shoot him. Chandler then turned loose his hold of the gun, and defendant shot him. After the shooting, when a light was struck, the coat of deceased was found spread out in the crib, at the place where he and defendant's wife had been lying down.

In his voluntary statement, which was read by the prosecution as evidence at the trial, defendant says: "I do not know what they (Chandler and my wife) were doing. I did not take time to investigate that. I knew they were there for no good. That was the only time I ever saw them lying down together anywhere. I can't say that I thought they were having connection with each other at the time I called to them at the door of the crib; but by finding them together I supposed that their object was to have connection with each other, and I shot him, Chandler, because I felt that that was the object of their being there together at that time."

This concise statement of the substance of the facts will sufficiently illustrate the main question presented in the record, and so ably argued by appellant's counsel.

The defense claimed was that, under the facts stated and our law, the homicide was justifiable. Our statute so reads: "Homicide is justifiable when committed by the husband upon the person of any one taken in the act of adultery with the wife, provided the

killing take place before the parties to the act of adultery have separated." (Penal Code, art. 567.) We are not aware that a similar statute, making such a homicide justifiable, can be found in the Codes of any other State; though the principle and precedent from which ours is derived is of most ancient origin. But in most, if not all, the States, as at common law, a killing under such circumstances would reduce the homicide from murder to manslaughter.

Blackstone says: "So, if a man takes another in the act of adultery with his wife, and kills him directly upon the spot, though this was allowed by the laws of Solon, as likewise by the Roman civil law (if the adulterer was found in the husband's own house), and also among the ancient Goths, yet in England it is not absolutely ranked in the class of justifiable homicide as in case of a forcible rape, but it is manslaughter. It is, however, the lowest degree of it; and therefore in such a case the court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation." (4 Black. Com. (Chitty), side p. 191.)

Mr. Bishop states the rule as it now obtains thus: "If a husband finds his wife committing adultery, and, provoked by the wrong, instantly takes her life or the adulterer's, . . . . the homicide is only manslaughter. But if on merely hearing of the outrage he pursues and kills the offender, he commits murder. The distinction rests on the greater tendency of seeing the passing fact, than of hearing of it when accomplished, to stir the passions; and if a husband is not actually witnessing the wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrong-doer, the offense is reduced to manslaughter." (2 Bish. Crim. L. (7th ed.), § 708.)

Our statute uses the expression "taken in the act of adultery with the wife." The question is as to the proper meaning or construction of these terms. Do the words, when properly construed, mean that the husband must discover, find, or see the wife and adulterer in the very act of illicit intercourse or copulation in order to constitute the offense denominated "taken in the act of adultery?"

Such positive proofs of the commission of the crime of adultery are not required, and are rarely attainable. (As a crime, adultery itself may be established and proven by circumstantial testimony. (*Richardson* v. *The State,* 34 Texas, 142.) Should the law hold the husband to a greater or higher degree of proof than itself requires to establish a given fact? It is a late hour of the night,— the parties are found in a corn crib some distance from the house, lying down in the dark. They refuse, at first, to answer when called;

then, when the wife answers, she denies that any one is with her,—when deceased gets up he clutches the gun,— defendant finds that the one whose previous conduct and "carrying on" with his wife has excited his suspicions is the one he has thus found in company with his wife.    What would any reasonable, sensible man have concluded from these circumstances?    In other words, how did the matter reasonably appear to defendant?    To him are not these facts "confirmations strong as proofs of holy writ?"    Could it have been otherwise than that he had caught the parties in the act of adultery, either just as they were about to commit, or just after they had in fact committed it?    His voice when he called, perhaps, had arrested them in the very act of carnal coition, and if that were so, then were not the parties caught or taken by him in adultery?    Does not the law always estimate a man's right to act upon reasonable appearances?    Taking into consideration the *res gestæ*,— taking the acts of the parties and their words coupled with their acts,— and were not the appearances of a character such as would have created the reasonable apprehension and conviction, in a person of ordinary mind, that the parties thus taken were taken in the act of adultery?

We are of opinion that the correct doctrine is that enunciated in *The State* v. *Pratt*, 1 Houston's Delaware Reports, 249.    In passing upon the construction and application of a statute substantially similar to ours, except that in Delaware the homicide under such circumstances would only have been reduced from murder to manslaughter instead of being justifiable, as with us, it was held: "If a husband find another in the act of adultery with his wife, and in the first transport of passion excited by it then and there kills him, it will not be murder, but manslaughter only.    It is not necessary, however, that he should witness an act of adultery committed by them.    If he saw the deceased in bed with his wife, or leaving it, or found them together in such a position as to indicate with reasonable certainty to a rational mind that they had just then committed the adulterous act, or were then about to commit it, the effect will be the same; and if, under such circumstances, the mortal blow was then and there given, the killing will be manslaughter merely.    But no other knowledge on the part of the husband, however positive, otherwise acquired of their adulterous intercourse can suffice to mitigate and reduce the crime from murder to manslaughter."    (See same case in 1 Crim. Law Mag., pp. 809, 810.)

As to a proper construction of the expression "taken in the act," we cannot believe that the law requires or restricts the right of the husband to the fact that he must be an eye-witness to physical

coition of his wife with the other party. As we have seen, adultery can be proven by circumstances, and the circumstances in this case were not hearsay so far as this defendant was concerned; they transpired in his own presence, sight and hearing. A mistake may possibly exist as to the fact; "but if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal, he is guilty of no offense" (Penal Code, art. 45), provided it be such mistake as does not arise from want of proper care on his part. (Penal Code, art. 46.) A party may always act upon reasonable appearances, and his guilt depends upon the reasonableness of the appearances, judged of from his own standpoint.

Mr. Bishop's rule, as above quoted, also commends itself to us as both just and proper: "If a husband is not actually witnessing his wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrong-doer, the offense is reduced to manslaughter." (Citing *The State* v. *Holmes*, 54 Miss., 153; *Biggs* v. *The State*, 29 Ga., 723; *Cheek* v. *The State*, 35 Ind., 492.) And to the same effect is *Maher* v. *The State*, 10 Mich., 212. If the offense would be manslaughter at common law, and in most of the other States, it would in like circumstances be justifiable homicide under the special provisions of our statute. (Penal Code, art. 576.)

In his charge to the jury the learned trial judge instructed them fully and ably upon the law of murder of the second degree (murder in the first degree being abandoned) and manslaughter. His charge upon justifiable homicide, predicated upon the statute, was in these words, viz.: "If the jury find that the defendant shot and killed the said Chandler at the time and place as alleged, and it also appears from the testimony that defendant shot and killed said Chandler when taken in the act of adultery or carnal intercourse with the wife of the defendant, and before they (Chandler and the wife) had separated, then they will find him not guilty."

The very gist of the issue made by the facts in the case was as to whether the facts tended to show that the parties were "taken in the act of adultery," and in all such cases, we imagine, the principal contest will be as to that fact. Such being true, it is a part of the law of such cases that the jury should be properly instructed as to what is meant by the expression "taken in the act." Without some explanation of the phrase, a jury would scarcely be able to comprehend and understand its import, so as correctly to apply it to the facts. They would, perhaps, be most likely to interpret it as

meaning that the parties must be taken in the very act and process of carnal intercourse and copulation.

Again: it was important that the jury should have been instructed as to the meaning of the other expression used in the statute,—" before the parties to the act of adultery have separated." Giving the language a too literal construction, they might infer that it meant that the parties must be physically united with the *rem in re*, in the act of copulation, and that it would be a separation though they might still be in the same bed or same room. Evidently the statute means no such thing, and contemplates only that the parties are still together in company with each other, after the act, when the homicide is committed.

Again, it is most clear that the word "adultery," as used in the statute, cannot be, or mean, the adultery which is defined as a specific offense by the Code, and which is "the living together and carnal intercourse with each other, or habitual carnal intercourse with each other," etc., of a man and woman, etc. (Penal Code, art 333.)

It cannot be that statutory adultery must be shown by a husband justifying under the law we are discussing. Evidently ecclesiastical adultery is meant,— adultery as it is known in common parlance,— "violation of the marriage bed," whether the adultery consisted of but one or more acts, or whether the parties lived in habitual carnal intercourse or not. It was part of the law of the case that "adultery," as used in this statute, should have been explained to the jury.

There were no special exceptions to the charge of the court, but the defects of omission pointed out are in our opinion fatal to the sufficiency of the charge, which under the statute must set forth distinctly the law applicable to the facts. Defendant's counsel submitted several requested instructions which should have called the attention of the court to the omissions in its own charge, though it might not feel inclined to give said instructions as presented and requested.

For the errors in the charge of the court, as above pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered June 13, 1885.]